## Ray VINSON, Jr., Respondent/Cross–Appellant,

### v.

## Joe ADAMS, Appellant/Cross–Respondent.

### No. ED 86089.

Missouri Court of Appeals,
Eastern District,
Division Five.

April 11, 2006.

 
 

 
 

Edward L. Dowd, Jr., Saint Louis, MO, for respondent/cross-appellant.

Michael A. Gross, St. Louis, MO, for appellant/cross-respondent.

## *OPINION*

GLENN A. NORTON, Chief Judge.

Joe Adams appeals the judgment entering a full order of protection against him under the Adult Abuse Act upon allegations that he stalked Ray Vinson. Vinson cross-appeals, challenging that part of the order prohibiting Adams from being within ten feet of him. We affirm.

## I. BACKGROUND

Vinson and his wife have been in litigation to dissolve their marriage.[1] Vinson's wife hired Adams to provide security and to keep Vinson under observation. Thereafter, Vinson filed a petition under the Adult Abuse Act alleging that Adams was stalking him.

In the petition, Vinson alleged that Adams had accosted him while he was conducting business at American Equity Mortgage and threatened "I'll take you apart you understand that." Ownership of American Equity Mortgage is an issue in the Vinsons' dissolution, and, under a *pendente lite* ("PDL") judgment, Vinson is allowed access to the business but is prohibited from contact with his wife while on the premises. At the hearing on his stalking petition, Vinson testified that one day

while at American Equity Mortgage for a meeting, Adams followed him down a hallway:

> Mr. Adams was on my heels, and I mean within 15 inches of my back. . . . I get to the end of the hall, turn left. I drop—I had a file folder in my hand. I dropped some papers. As I reached down to get those papers, just as I turned to my right to get those papers from the floor, Mr. Adams practically ran over the top of me and we made contact—his shins and knees and arms were all over the top of me. He was within 15 inches of me, I'm guessing. It was very, very, very, very close. Too close to stop, certainly, when I stopped. Which spontaneously you would just reach down to pick those papers up. And that's what I did, and he practically ran over the top of me.

Vinson testified that Adams said several things when this happened:

> One was, "You're out of your league pal" . . . "I will cut you up," or something like that. I mean some threatening things, I think that we have documented. But it was very threatening and certainly told me, in no uncertain terms, that I should certainly not get near him or be around there.

Adams testified that he stopped when he saw Vinson drop the papers an arm-length away and was just standing there when Vinson shoved into him. He told Vinson "don't push your luck," "don't fuck with me" and "we're not in the same league now." Adams admitted that he told Vinson that he would "take him apart," but denied that he ever used the word "cut." He did not feel these were threats, just attempts to keep Vinson from being ag-

---

1. Vinson and his wife have both sought orders of protection against each other, and the judgments on those petitions have been appealed separately in case number ED86116 (appeal from full order of protection entered against Vinson) and case number ED86117 (appeal from denial of Vinson's petition for order of protection against his wife).

gressive. An employee of American Equity Mortgage testified that she saw Vinson stop and push Adams and then it appeared they were "having words."

Vinson also claimed in his petition that, while at the county court house, Adams said "I'm still gonna get you." At the hearing, Vinson testified that as Adams was leaving the courtroom, "he turned to me and said, 'I'm going to get you,' or 'I'm going to kill you,' or muttered something," while pointing his finger. Adams testified that he said "That's okay, Ray. I got you anyway. I got you." He denied saying "I'm going to get you."

Vinson alleged in the petition that, before the incident at American Equity Mortgage, Adams had inquired into purchasing a machine gun. At the hearing, Vinson testified that he was also aware that this would not have been the first gun that Adams had ever owned. Vinson also alleged that he was afraid Adams would cause him immediate severe physical harm and testified at the hearing that Adams's actions put him in fear.

The court entered a full order of protection, in which Adams was ordered not to "stalk, or disturb the peace of [Vinson] wherever [Vinson] may be and not be within ten feet of [Vinson]." On appeal, Adams challenges the sufficiency of the evidence that he stalked Vinson, and Vinson challenges the ten-foot restriction in the order.[2]

## II. DISCUSSION

■ In this court-tried case, we will sustain the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it

erroneously declares or applies the law. *Wallace v. Van Pelt,* 969 S.W.2d 380, 382 (Mo.App. W.D.1998) (citing *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976)). "Substantial evidence is competent evidence from which the trier of fact could reasonably decide the case." *Wallace,* 969 S.W.2d at 382. We defer to the trial court's determinations regarding credibility and view all facts and any inferences therefrom favorably to the judgment. *Id.* at 383.

### A. Adams's Appeal Regarding Sufficiency of the Evidence

■ Any adult who has been the victim of stalking may seek relief under the Adult Abuse Act by filing a verified petition. Section 455.020.1 RSMo 2000. "Stalking" is defined as

> ... when an adult purposely and repeatedly engages in an unwanted course of conduct that causes alarm to another person when it is reasonable in that person's situation to have been alarmed by the conduct.

Section 455.010(10) RSMo Cum.Supp.2004. A "course of conduct" is a "pattern of conduct composed of repeated acts over a period of time, however short, that serves no legitimate purpose." Section 455.010(10)(a). "Legitimate" activity is that which is sanctioned by law or custom, is lawful, or is allowed. *Overstreet v. Kixmiller,* 120 S.W.3d 257, 258 (Mo.App. E.D. 2003). Two or more incidents "evidencing a continuity of purpose" constitutes repeated conduct. Section 455.010(10)(b). To cause "alarm" means to cause fear of danger of physical harm. Section 455.010(10)(c). Allegations of stalking

---

**2.** The issue of this Court's jurisdiction has been raised. Because the original order was renewed and is now effective until April 30, 2006, the issues in this appeal are not moot, and this Court has jurisdiction. We affirmed

the renewal order, which was appealed separately, today. *See Vinson v. Adams, slip op.,* ED87355, 2006 WL 911868, —— S.W.3d —— (Mo.App. E.D. April 11, 2006).

must be proven by a preponderance of the evidence. Section 455.040 RSMo Cum. Supp.2004.

Adams contends that there was insufficient evidence of stalking because his actions at American Equity Mortgage served a legitimate purpose, there was not substantial evidence of what he threatened to do to Vinson, and, regardless, none of his actions or words reasonably could have caused Vinson to become alarmed. We disagree.

■ Although it may have been lawful in the course of his obligations to provide security for Vinson's wife for Adams to follow Vinson down the hallway, he went beyond what could be considered legitimate surveillance when he threatened Vinson with physical harm. *See Overstreet,* 120 S.W.3d at 260–61 (threats to employee went beyond poor management and therefore served no legitimate purpose); *see also Brockert v. Syler,* 95 S.W.3d 187, 192 (Mo.App. W.D.2003) (assuming, without deciding, that grandfather's otherwise lawful contact with biological grandson nevertheless may not have had a legitimate purpose because grandfather knew child was unaware he was his grandfather).

■ Adams argues that Vinson's testimony as to what Adams said at American Equity Mortgage was inconsistent and equivocal and cannot constitute substantive evidence of stalking. Adams points out that in the petition, Vinson alleged that Adams said "I'll take you apart," but then at trial he testified that Adams said "I will cut you up," or "something like that. I mean some threatening things." We disagree that the testimony is conflicting to the point of losing probative value because either version of what Vinson claimed

Adams said tends to prove that Adams threatened him with physical harm. And Adams himself admitted that he told Vinson he would "take him apart." It was the trial court's responsibility to determine which version was more credible and entitled to more weight. "The trial judge is in the best position to gauge the credibility of the witnesses and to determine the existence of any reasonable apprehension of abuse that a petitioner may harbor; conversely, the judge can determine whether a given respondent appears capable of the feared abuse." *Parkhurst v. Parkhurst,* 793 S.W.2d 634, 636 (Mo.App. E.D.1990).

■ Similarly, Adams argues that Vinson's testimony that Adams said "I'm going to kill you" or "I'm going to get you" at the courthouse was vague and inconsistent and should be discounted. On the other hand, he points out, his own testimony that he said "I got you" was unequivocal. Under our standard of review, we disregard Adams's testimony. Moreover, the difference between "I'm going to get you" and "I'm going to kill you" is a matter of degree—an important distinction in some situations, but here the crucial point is that it would have been reasonable for Vinson to take either statement as a threat of physical harm, especially in light of Adams's earlier threat of physical violence. Under the statute, it is the entire course of conduct—not each individual act in isolation—that the petitioner must show reasonably put him in fear of physical harm. *See* section 455.010(10).

■ In sum, the evidence was sufficient . to establish a pattern of conduct consisting of these two instances occurring over a period of time, which served no legitimate purpose.[3] Moreover, there was substantial

---

**3.** Because the incident at American Equity Mortgage and the incident at the courthouse, taken together, support the trial court's con-

clusion of stalking and its entry of a full order of protection, we need not address whether the additional act of inquiring into the pur-

evidence to support the conclusion that this course of conduct was unwanted and reasonably put Vinson in fear of physical harm. The trial court did not err in granting a full order of protection. Adams's point on appeal is denied.

### B. Vinson's Appeal Regarding Ten–Foot Requirement

■ Vinson contends that the order allows Adams to be within ten feet of him, which is irreconcilable with the order's prohibitions on stalking and disturbing his peace and inconsistent with the PDL judgment allowing Vinson to conduct business in his usual manner at American Equity Mortgage. By allowing Adams to "shadow" Vinson from ten feet and one inch away, Vinson claims he has little protection and the order fails to meet the goals of the Adult Abuse Act to prevent potential violence. We disagree.

The requirement that Adams not be within ten feet of Vinson is a further restriction on his conduct beyond the prohibitions on stalking Vinson and disturbing Vinson's peace. This restriction actually provides additional protection for Vinson and is consistent with the goals of the Act. The order does not allow Adams to stalk or disturb Vinson as long as he stays at least ten feet away. Rather, it prohibits Adams from being within ten feet of Vinson even if he is *not* stalking him or disturbing his peace. Therefore, there is no internal inconsistency in the order, nor any conflict between the order of protection and the PDL judgment. If following Vinson at his place of business, or anywhere, amounts to stalking or disturbing Vinson's peace, then it is a violation of the order even if it occurs ten feet and one inch away.

chase of a machine gun sometime before those incidents lends any further support to

### III. CONCLUSION

The judgment is affirmed.

NANNETTE A. BAKER and ROY L. RICHTER, JJ., concurring.