

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| J.W.M., | ) | No. ED109500 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court of |
| | ) | Lincoln County |
| vs. | ) | 20L6-PN00388 |
| | ) | |
| D.L.O., | ) | Honorable Patrick S. Flynn |
| | ) | |
| Appellant. | ) | Filed: April 19, 2022 |

Michael E. Gardner, P.J., James M. Dowd, J., and Lisa P. Page, J.

## OPINION

Appellant D.L.O. (DLO) appeals the trial court's judgment which entered a full order of

protection against her and in favor of Respondent J.W.M., pursuant to the Missouri Adult Abuse

Act (MAAA), sections 455.010 to 455.085. This is the first of three separate appeals arising

from the same trial in which DLO was found to have stalked not only Respondent J.W.M. (Son),

but also his parents, B.L.M. (Mother) and C.D.M. (Father).

DLO asserts that there was insufficient evidence that she was guilty of stalking under

section 455.020.[1] We affirm the judgment of the trial court because there was ample evidence

that DLO stalked Son in that DLO made repeated, purposeful, and unwanted contact with Son in

person, through text messages, and indirectly through one or more third persons that constituted

---

[1] All statutory references are to RSMo 2020 unless otherwise indicated.

a "course of conduct," as that phrase is used in section 455.010(15)(b), which was subjectively alarming to Son and would have been objectively alarming to a reasonable person.

## Background

Son met DLO in April 2019 through an online dating app.[2] They had a sexual relationship that ended in June 2019. DLO is mother to a child born in March 2020, whom she claims is Son's biological child.

In spring 2020, DLO contacted Son asking for monetary support for the child. Son gave DLO money to complete a DNA test to determine paternity, but no other money.

On May 26, 2020, Son received the following text message:

> "My dad is about that life. He had people run up on my sister's baby daddy, and she hadn't had a single problem with him. I'm trying to handle this the best way, but maybe you and my dad just need to have a talk because my nice route is not working. My best friend was literally on her way to drag her friend out of the car, beat her ass, like you have no idea."

Son testified that he believed this text came from DLO. Son filed a police report following that text message and changed his phone number. He also informed his parents, with whom he resides, about the text message.

After DLO again requested Son pay child support, he suggested they have a court determine child support. DLO then filed multiple orders of protection against Son in the circuit courts of St. Charles County and St. Louis County, as well as in a county court in Texas which included the accusation that Son raped her.

On July 1, 2020, following a hearing, the court in St. Charles County dismissed DLO's order of protection against Son. However, as the parties departed the courthouse, DLO accosted and berated Son, and she had to be removed by security. Later that day, Son was with his

---

[2] Pursuant to section 595.226, we refer to the parties by their initials.

girlfriend when *she* received a text message which they read together and which stated (1) that DLO knew personal information relating to Son's family, (2) that she threatened to try to have Mother fired from her job, and (3) that her "daddy is about to be on it." The text message further stated, "I'm not making threats, I'm making promises," and that Son was "worth more dead than alive to me." That same day, flyers were placed in mailboxes throughout Son, Mother, and Father's neighborhood depicting Son as a sexual predator and listing his home address.

On August 5, 2020, three vehicles owned by Son, Mother, and Father and located in their driveway were spray painted and had their tires slashed during the night while Son, Mother, and Father were inside. Son testified at trial that he recognized DLO's voice on security camera footage that captured those events.

Following the tire-slashing attack, Son, Mother, and Father each filed petitions for orders of protection against DLO. The court entered *ex parte* orders of protection on each case on August 7, 2020. After she was served with those orders, DLO filed her own petitions requesting orders of protection against Son, Mother, and Father on behalf of herself and her son in St. Louis County.

At trial, Son, Mother, and Father testified they felt threatened and scared for their physical safety which required them to alter their day-to-day activities, and they believed that DLO was responsible for all the events targeting their family. Moreover, Son testified he had no known enemies.

For her part, DLO denied any responsibility or involvement with the text messages or Facebook messages received by Son, Mother, or Father, and that she was out of town during the tire-slashing attack on August 5, 2020.

3

Neither party requested findings of fact and conclusions of law, and none were entered by the trial court. Nevertheless, the court found DLO's testimony untruthful and not credible. The court entered full orders of protection against DLO in favor of Son, Mother, and Father.[3]

## Standard of Review

Appeals from court-tried civil cases are governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). We affirm the trial court's judgment "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Id.* at 32. We view "the evidence and permissible inferences drawn from the evidence in the light most favorable to the judgment." *Bateman v. Platte Cty.*, 363 S.W.3d 39, 43 (Mo. banc 2012). We defer to the trial court's determinations of credibility. *Schwalm v. Schwalm*, 217 S.W.3d 335, 336 (Mo. App. E.D. 2007). "Because the trial judge is in the best position to gauge the credibility of the witnesses, in cases under the Adult Abuse Act, the discretion of the trial court should not often be superseded." *Wallace v. Van Pelt*, 969 S.W.2d 380, 383 (Mo. App. W.D. 1998); *Parkhurst v. Parkhurst*, 793 S.W.2d 634, 637 (Mo. App. E.D. 1990).

Due to the "potential stigma that may attach to an individual who is labeled a 'stalker' under the Missouri Adult Abuse Act, trial courts must exercise great care ... to ensure sufficient evidence exists to support all elements of the statute before entering a full order of protection." *M.L.G. v. R.W.*, 406 S.W.3d 115, 117 (Mo. App. E.D. 2013).

---

[3] DLO's appeals of the orders of protection in favor of Father and Mother are the subject of separate appeals being decided by this Court contemporaneously herewith.

4

## Discussion

DLO's sole point on appeal contends that the trial court erred in granting a full order of protection based on stalking because there was insufficient evidence that Appellant purposely engaged in an unwanted course of conduct that caused Respondent to reasonably fear physical harm. We disagree and find that all the elements of stalking within the meaning of the statute were met.

The MAAA provides that "[a]ny person who has been subject to domestic violence by a present or former family or household member, or who has been the victim of stalking or sexual assault, may seek relief under sections 455.010 to 455.085 by filing a verified petition alleging such domestic violence, stalking, or sexual assault by the respondent." Section 455.020(1). Section 455.010(15) defines stalking to be when "any person purposely engages in an unwanted course of conduct that causes alarm to another person, or a person who resides together in the same household with the person seeking the order of protection when it is reasonable in that person's situation to have been alarmed by the conduct." Section 455.010.

A "course of conduct" under the MAAA is a "pattern of conduct composed of repeated acts over a period of time, however short, that serves no legitimate purpose." Section 455.010(15)(b). That provision provides examples of actions that constitute an unwanted course of conduct whether done directly, indirectly, or through a third party. Those include following, threatening, contacting, or communicating to a person by any action, method, or device. Section 455.010(15)(b). Additionally, an activity serves no legitimate purpose when it is unlawful, not allowed, or not sanctioned by law or custom. *N.C. v. Y.Q.L.*, 609 S.W.3d 56, 60 (Mo. App. E.D. 2020).

5

To "alarm" someone for purposes of the MAAA means to "cause fear of danger of physical harm." Section 455.010(15)(a). Alarm contains both a subjective and objective component, and the record must contain sufficient evidence showing both that the victim had subjective fear of physical harm, and that a reasonable person under the same circumstances would have feared physical harm. *E.D.H. v. T.J.*, 559 S.W.3d 60, 64 (Mo. App. E.D. 2018).

Turning now to the circumstances of this case, we affirm the trial court's judgment because there was ample evidence that DLO stalked Son by engaging in a course of conduct with no legitimate purpose that was subjectively alarming to Son and would have been alarming to a reasonable person in similar circumstances. While no findings of fact or conclusions of law were requested or entered, we presume that the trial court made findings in accordance with the decree entered and we may affirm the judgment under any reasonable theory supported by the evidence. *Uelk v. Directory Distribg. Associates, Inc.*, 803 S.W.2d 632, 634 (Mo. App. E.D. 1991).

With regard to the trial court's finding that DLO engaged in a "course of conduct" of stalking, we conclude that there was sufficient evidence in the record supporting that finding. The reasonable inference on this record was that DLO was responsible for the May 26, 2020 text message that threatened to involve her father who she said had a history of violence. Likewise, DLO's involvement in the text message sent on July 1, 2020 that stated Son was "worth more dead than alive," seems highly likely given that it occurred the same day as the incident in which DLO accosted and berated Son outside the St. Charles County courthouse. Finally, attributing to DLO the August 5, 2020 tire-slashing attack when DLO's voice was captured by the security camera at the scene is not a stretch. Together, these events show a course of conduct that occurred and escalated over time sufficient to support a finding of stalking under the statute. *See*

6

*K.M.C. v. M.W.M.*, 518 S.W.3d 273, 279 (Mo. App. E.D. 2017) (finding that escalating events of repeatedly following and approaching a person with no legitimate purpose constitutes stalking).

Moreover, we conclude that DLO's conduct had no legitimate purpose. Her conduct was threatening and violent and readily crossed the threshold between normal social interactions and stalking, at which point the conduct no longer has a legitimate purpose. *See N.C.*, 609 S.W.3d at 60 (finding that purposeful and unwanted contacts, although not illegal, blew past the threshold at which point alarming conduct no longer had a legitimate purpose).

Next, we find that DLO's course of conduct was subjectively alarming to Son. We note that under section 455.010(15)(b), it is the entire course of conduct – not each individual act in isolation – that must reasonably alarm the petitioner. *Vinson v. Adams*, 188 S.W.3d 461, 465 (Mo. App. E.D. 2006). Here, Son testified that he filed three different police reports following the events of May 26, July 1, and August 5, 2020. Son further testified that each event alarmed him because he felt threatened and feared physical harm by DLO due to the increasing violent nature of DLO's conduct and because he had never experienced such threats before. Additionally, Son also changed his phone number, increased security and lockdown protections around his home, changed his daily routines in order to prevent any interactions with DLO, and was prescribed medication for his anxiety and panic attacks.

We find, therefore, that the record demonstrates that Son was subjectively fearful of physical harm because DLO's course of conduct created more uneasiness, nervousness, unhappiness, or the like for Son than what is commonly experienced in day-to-day living. *K.M.C.*, 518 S.W.3d at 279; *Wallace*, 969 S.W.2d at 386.

Likewise, we conclude that DLO's repeated and overt threats of physical harm to Son would have been alarming to a reasonable person because they were repeated and escalated in

7

nature from written threats to physical destruction of property and threats of physical violence. It is objectively reasonable that such conduct could have escalated further to physical harm. *See N.C.*, 609 S.W.3d at 61 (finding reasonable alarm from persistent and increasingly unreasonable nature of the contacts).

Finally, we turn to DLO's claims that her conduct constituted merely irritating and unpleasant contacts that were insufficient to constitute a "course of conduct" under the MAAA. In light of our foregoing discussion, we find this unpersuasive.

We are also unpersuaded by DLO's claims of innocence with regard to a number of the events at issue including some of the threatening text messages and the tire-slashing attack. The trial court found DLO's testimony to be unconvincing and untruthful. And the trial court, in a stalking action under the MAAA, is in the best position to gauge the credibility of witnesses and to determine whether a given respondent appears capable of the feared abuse. *Vinson*, 188 S.W.3d at 465. As such, the trial court was not required to accept any of DLO's testimony and nor do we. *S.A. v. Miller*, 248 S.W.3d 96, 100–01 (Mo. App. W.D. 2008).

We conclude that this case fits within the purpose of the MAAA, which is not to referee minor arguments and incivilities between two adults, but to prevent potential violence and unnecessary, unjustified infliction of emotional distress. *K.M.C.*, 518 S.W.3d at 279; *Wallace*, 969 S.W.2d at 387. Therefore, we find the full order of protection in this case to be supported by the evidence.

8

## Conclusion

For the reasons stated above, we affirm the trial court's judgment.

_____
James M. Dowd, Judge

Michael E. Gardner, P.J., and
Lisa P. Page, J., concur.

9